UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MARK SILIVEN et. al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Cause No. 1:08-cv-1192-WTL-DML |
| ) | |
| INDIANA DEPARTMENT OF CHILD ) | |
| SERVICES et. al., ) | |
| ) | |
| Defendants. ) | |

**ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This cause is before the Court on the Plaintiffs' motion for summary judgment (Docket No. 26) and the Defendants' cross-motion for summary judgment (Docket No. 29). The motions are fully briefed, and the Court being duly advised, **GRANTS** the Defendants' motion and **DENIES** the Plaintiffs' motion with regard to the Plaintiffs' federal claims and **REMANDS** the Plaintiffs' state law claims to the Wayne County Superior Court for the reasons set forth below.

**I. SUMMARY JUDGMENT STANDARD**

Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is

a genuine issue of material fact that requires trial." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007). Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II. BACKGROUND

Teresa and Mark Siliven live near Richmond, Indiana with their son C.S. Because Teresa worked outside the home the Silivens took C.S. to daycare at Ashley Woods's home. Although Woods admittedly had some difficulty with C.S., the Silivens never had any real concern for C.S.'s safety and they never considered finding another childcare provider.

On January 16, 2008, Teresa woke C.S., dressed him, and dropped him off at daycare. She did not notice anything out of the ordinary. When Teresa picked C.S. up at the end of the day, Woods reported that C.S. had to be put in time out in the afternoon. She did not elaborate on what C.S. did or who put him into time out. Teresa took C.S. home, fed him dinner, and prepared to give him a bath. While undressing C.S., Teresa noticed some bruises on his arm. She called Mark in to look at them. C.S. did not know how he got the bruises and he said that his arm did not hurt.

Ultimately the Silivens took C.S. to the Richmond Police Department ("RPD") to file a report. After making their report and having C.S.'s bruises photographed and documented, the Silivens went home and put C.S. to bed. They contacted Woods and informed her that C.S. would not return to daycare until the Silivens determined what had happened to him.

C.S.'s case was assigned to RPD Detective Michael Britt. On January 18, 2008, after

contacting the Department of Child Services ("DCS, Detective Britt called Teresa to inform her that DCS was investigating the case and would be contacting the Silivens. On the afternoon of the 18th, DCS Case Manager Amber Luedike visited the Siliven home where Mark was watching C.S. Mark explained the incident to Luedike, who observed C.S. and opined that, other than the bruises, he appeared happy and healthy. Also on the 18th, Luedike asked Teresa to take C.S. to the hospital to have his bruises examined. Accordingly, that evening the Silivens took C.S. to the Reid Hospital emergency room. The emergency room physician could not determine what caused the bruises. On January 23, Luedike received a copy of the doctor's report. She sent that report and a brief synopsis of the events to the child abuse clinic at Riley Hospital in Indianapolis.

Also on January 23, Luedike and Detective Britt interviewed Woods. Woods denied knowledge of how C.S. obtained his bruises. She could not recall him acting injured or upset on the 16th.

The next day, January 24, Luedike received a response from the doctor at Riley Hospital. The doctor stated that C.S.'s marks were consistent with an adult forcibly grabbing him by the arm. Also on the 24th, Luedike received a copy of an old DCS file describing a physical altercation between Mark and his teenage stepdaughter. Either later that day, or on January 25,[1] Luedike called Teresa at work, explained that they could not rule anyone out, and asked if Teresa

---

[1] There is some dispute as to when Luedike called Teresa. Luedike recorded the conversation in the DCS call log on January 24. However, the Silivens both testified that the conversation occurred on January 25. Despite this discrepancy, this is not a "material" fact, which precludes summary judgment. However, in ruling on the Defendants' motion for summary judgment the Court must take all facts in the light most favorable to the Plaintiffs. Accordingly, for purposes of this entry, the Court will presume that the conversation regarding the polygraph test occurred on January 24.

3

and Mark would take a polygraph test. Teresa agreed and said she would call Mark to see if he would consent as well. Although understandably upset about the turn of events, Mark agreed to take a polygraph test as long as Luedike also tested Woods and her husband.

On the afternoon of Friday, January 25, Luedike met with Terry Stuttle, the director of the Wayne County DCS, Helen Shultz, Luedike's supervisor, and Aaron Lawson, the staff attorney for the Wayne County DCS. She explained the status of the C.S. investigation and opined that because they did not know who had caused C.S.'s injuries, he was not safe at home. Accordingly, Luedike recommended that C.S. be removed. The rest of the participants agreed and Stuttle instructed Luedike to remove C.S. Because Stuttle did not think there was time to obtain a court order authorizing C.S.'s removal, he told Luedike to make an emergency detention.

Luedike called the Wayne County Sheriff's Department and asked for assistance removing C.S. When Luedike and the sheriffs arrived at the Silvens' home, Mark was home alone with C.S. Justifiably shocked and upset, he refused to leave the house with C.S. and called Teresa, who was on her way home from work. Teresa, who was at this point in tears, asked to speak with Luedike. Luedike explained that it was Stuttle's decision to remove C.S. and gave Teresa his phone number. Teresa called Stuttle, who asked if there was a relative who could watch C.S. Teresa explained that the closest relative was Mark's mother in Ohio. Stuttle said that was not an option, as DCS did not have jurisdiction in Ohio. Teresa offered to take C.S. to a hotel. Stuttle said that was not acceptable as she could not be alone with C.S. either. Stuttle said that if they could not work something out, then C.S. would be placed in foster care. Finally, Teresa and Stuttle decided that Teresa would take C.S. to his grandmother's house in Ohio.

4

Luedike wrote out the safety plan and had Teresa and Mark sign it. Luedike then called another case manager, Angela Gibson, to follow Teresa to Ohio.

Around 7:00 p.m., Teresa and C.S. left for Ohio. Gibson followed them in another car. When they arrived at Bobbie Siliven's house Gibson inspected the premises and explained the safety plan to Bobbie. After Bobbie signed the safety plan, Gibson left. She returned the next morning and explained that a detention hearing would be held and a judge would decide whether Teresa and C.S. could return home.

On Monday, January 28, the juvenile court held a detention hearing in C.S.'s case. The judge heard DCS's evidence and allowed Mark and Teresa to make statements. Ultimately, the judge announced that he was ruling in favor of the Silivens and that C.S. could return home. C.S. returned home that night.

The investigation was closed on March 18, 2008, and no charges were ever brought. On June 4, 2008, the Silivens filed a tort claims notice. They then instituted this suit in the Wayne County Superior Court on August 13, 2008, alleging violation of their Fourth and Fourteenth Amendment rights as well as violation of state law. The Defendants properly removed to this Court pursuant to 28 U.S.C. §§ 1441 and 1446.

### III. DISCUSSION

As an initial matter, the Plaintiffs' Complaint purports to sue DCS under 42 U.S.C. § 1983. The Plaintiffs acknowledge in paragraph 10 of their Complaint that DCS is a state agency. Thus, DCS is not a "person" as defined by § 1983. *See Fairley v. Fermaint*, 482 F.3d 897, 904 (7th Cir. 2007) (citations omitted). Because DCS is not a "person," the Plaintiffs' federal claims brought against it under § 1983 fail as a matter of law. Accordingly, summary judgment is

5

**GRANTED** to DCS on the Plaintiffs' federal claims.

The Plaintiffs' Complaint also names Stuttle and Luedike as defendants in their individual capacities. In their motion for summary judgment, Stuttle and Luedike argue that because they are qualifiedly immune, they are entitled to summary judgment on the Plaintiffs' federal claims. "Under the doctrine of qualified immunity, government officials are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known.'" *Doe v. Heck*, 327 F.3d 492, 515 (7th Cir. 2003) (quoting *Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 620 (7th Cir. 2002)). In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court set out a two-part analysis to determine if qualified immunity is appropriate in a given case. First, the Court must determine if "the facts alleged show [that] the officer's conduct violated a constitutional right." *Id.* at 201. If the officer's conduct did violate a constitutional right, then the Court must next determine "whether the right was clearly established." *Id.*

In *Pearson v. Callahan*, 129 S.Ct. 808 (2009), the Supreme Court relaxed the *Saucier* "two-step." The Court stated that while the *Saucier* sequence is often appropriate, "it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 818. Thus, post-*Pearson*, a court can begin with either inquiry.

In the instant case, the Court focuses its inquiry on the second *Saucier* prong – whether the constitutional right allegedly violated was "clearly established." The Plaintiffs' Complaint

alleges violation of C.S.'s Fourth Amendment rights, and the family's Fourteenth Amendment substantive and procedural due process rights.  In order to be clearly established, a right's "contours must be 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Doe*, 327 F.3d at 515 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).  "This does not mean that 'an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.'" *Id.* (quoting *Hope*, 536 U.S. at 739).  It is the Plaintiffs' burden to show that the rights in question are clearly established.  *See Landstrom v. Ill. Dep't of Children and Family Servs.*, 892 F.2d 670, 675 (7th Cir. 1990) (citations omitted).  The Plaintiffs can meet this burden by "showing that there is 'a clearly analogous case establishing a right to be free from the specific conduct at issue' or that 'the conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights.'" *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009) (quoting *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001)).

      Plaintiffs cite *Croft v. Westmoreland County Children and Youth Services*, 103 F.3d 1123 (3d Cir. 1997), as an analogous case establishing that "a child protective worker cannot remove a child from his parents when there is such little evidence implicating a parent as the perpetrator." Resp. at 16-17.  In *Croft*, a child was removed from her parents after the county children's bureau received an anonymous tip that a father was abusing his daughter and a phone call reporting that the child was outside the house naked, walked to a neighbor's house, and reported that she slept in the same bed as her parents.  *Croft*, 103 F.3d at 1126.  Based on this evidence, the case worker ordered the father out of the house for the duration of the investigation.  The

case worker told the father that if he refused to leave, then the child would be placed in foster care. *Id*. at 1124-25. The trial court granted the defendants' motion for summary judgment, but the Third Circuit, finding the case worker's conduct "an arbitrary abuse of government power," reversed. *Id.* at 1127.

The Plaintiffs argue that *Croft* is analogous to their case and thus, that their Fourth and Fourteenth Amendment rights are clearly established and were violated by the Defendants. However, *Croft* is distinguishable from the instant case. In the case at bar, DCS conducted a ten-day investigation before it decided to remove C.S. In *Croft* there was no such investigation. In addition, Luedike and Stuttle knew that C.S. had been injured by an adult. In *Croft* there was "no physical evidence of sexual abuse" and the case worker "had no belief that such abuse had occurred." *Id.* Further, Luedike and Stuttle knew that Mark Siliven had previously had a physical conflict with his teenage stepdaughter. In *Croft* there was no such history. In short, the facts in *Croft* are so different from the facts of the Silivens' case that *Croft* cannot stand for the proposition that the Silivens' Fourth or Fourteenth Amendment rights were "clearly established" so that a reasonable DCS worker would have realized that temporarily detaining C.S. was a violation of those rights.

Furthermore, the Plaintiffs do not cite any evidence indicating that either Luedike's or Stuttle's conduct was so egregious that no reasonable person could have believed that it would not violate clearly established rights. The Seventh Circuit has upheld grants of qualified immunity in more extreme situations. *See, e.g.*, *Doe*, 327 F.3d at 492 (warrantless seizure of child at school and repeatedly threatening parents with removal of their children not a violation of clearly established rights; defendants were entitled to qualified immunity on plaintiffs' Fourth

8

and Fourteenth Amendment claims). The Seventh Circuit's recognition of qualified immunity in cases involving the removal of children from potentially abusive situations is grounded in the court's recognition that "the balance between a child's liberty interest in familial relations and a state's interest in protecting the child is nebulous at best," and "social workers and other state actors who cause a child's removal are entitled to qualified immunity because the alleged constitutional violation will rarely – if ever – be clearly established." *Brokaw v. Mercer County*, 235 F.3d 1000, 1023 (7th Cir. 2000). In addition, the Seventh Circuit has noted that "the Eighth, Fifth and Second Circuits have specifically found public employees engaged in child abuse investigations entitled to qualified immunity from § 1983 claims." *Landstrom*, 892 F.2d at 678.

Given the absence of case law indicating that the rights the Defendants' allegedly violated were clearly established, and the lack of evidence that the Defendants engaged in conduct so egregious that no reasonable person could have thought it constitutionally permissible, the Court concludes that the Defendants are entitled to qualified immunity. In doing so, the Court recognizes that this must have been a horribly painful and disturbing episode for the Siliven family, however, viewing the facts in the light most favorable to the Plaintiffs, the individual Defendants did not violate the Silivens' clearly established rights. Accordingly, Luedike's and Stuttle's motion for summary judgment is **GRANTED** as to the Plaintiffs' federal claims.

All that remains are the Silivens' state law claims. The Court's jurisdiction over these claims is based upon 28 U.S.C. § 1367, which provides for the exercise of supplemental jurisdiction over a claim based upon state law that is closely related to the federal claim in a case. However, "[w]hen the federal claim in a case drops out before trial, the presumption is that

the district judge will relinquish jurisdiction over any supplemental claim to the state courts." *Leister v. Dovetail, Inc.*, 546 F.3d 875, 882 (7th Cir. 2008). There are exceptions to that general rule, and the court should decide the merits of a supplemental state claim when: (1) the statute of limitations has run, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is "absolutely clear" how the state claims should be decided. *Davis v. Cook County*, 534 F.3d 650, 654 (7th Cir. 2008). None of those exceptions apply here. Remanding to the Wayne County Superior Court avoids any statute of limitations problems; none of this Court's resources have been expended on the state law claims, *see id.* ("the district court disposed of the federal claims on summary judgment, and so 'substantial judicial resources' have not yet been committed to the case"); and it does not appear to the Court that the proper resolution of the state law claims is so obvious as to overcome the presumption that remand is appropriate. Accordingly, the Court declines to exercise supplemental jurisdiction over the state law claims asserted in the Plaintiffs' Complaint.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment is **GRANTED** as to the Plaintiffs' federal claims. The Plaintiffs' motion is **DENIED** with regard to the Plaintiffs' federal claims. The Court declines to retain pendent jurisdiction over the Plaintiffs' state law claims and they are therefore **REMANDED** to the Wayne County Superior Court.

SO ORDERED:  12/28/2009

*William T. Lawrence*
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to:

Eric James Beaver
Indiana Office of the Attorney General
eric.beaver@atg.in.gov

Michael K. Sutherlin
Michael K. Sutherlin & Associates, PC
msutherlin@gmail.com

Cory Christian Voight
Indiana Office of the Attorney General
cory.voight@atg.in.gov